## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JENNIFER SCARBOROUGH, as Executor of the Estate of WYLEEK TINSLEY, Deceased, <br><br> Plaintiff, <br><br> v. <br><br> TOWNSHIP OF ABINGTON, POLICE CHIEF PATRICK MOLLOY, and JON DOE POLICE OFFICERS 1-10, <br> Defendants. | CIVIL ACTION <br><br> NO. _____ <br><br><br><br> **COMPLAINT** |

Plaintiff Jennifer Scarborough, as administrator of the Estate of Wyleek Tinsley, deceased, by and through their attorneys Marrone Law Firm, LLC, hereby allege as follows:

### INTRODUCTION

1.     On March 6, 2025, at approximately 11:00 AM, Defendants Jon Doe Police Officers 1-10 shot and killed nineteen-year-old Wyleek Tinsley. At the time of the shooting, Tinsley was unarmed and presented no threat of any kind to anyone. He was shot as a result of inappropriate, unjustified and unconstitutional use of deadly force by law enforcement officers acting within the course and scope of their employment as police officers in Abington Township.

### JURISDICTION AND VENUE

2.     This action is brought pursuant to 42 U.S. § 1983 to redress the deprivation under color of law of the Plaintiffs' Decedent's rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3.     This Court has supplemental jurisdictions over the plaintiffs' state law claim pursuant to 28 U.S.C. § 1367(a).

4.      Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the district in which the claims arose.

## JURY DEMAND

5.      Plaintiffs demand a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

6.      Plaintiff **JENNIFER SCARBAROUGH** is an adult individual who, at all relevant times, was a resident of the Commonwealth of Pennsylvania. At all relevant times, Plaintiff Jennifer Scarbarough was the mother of decedent Wyleek Tinsley.

7.      As of the date of this Complaint, The Pennsylvania Court of Common Pleas has made an Order for the issuance of Letters of Administration in favor of Plaintiff Jennifer Scarbarough, appointing her administrator of the Estate of Wyleek Tinsley, deceased.

8.      Defendant **TOWNSHIP OF ABINGTON**, is an administrative and/or political subdivision within the Commonwealth of Pennsylvania, and at all times relevant hereto, operated under the color of state law in creating and maintaining a Police Department and District Attorney's Office, was the employer of all individual Defendants, and was officially responsible for all policies, procedures, and practices of the Abington Township Police Department (ATPD) and the District Attorney's Office (DAO).

9.      Defendant **POLICE CHIEF PATRICK MOLLOY** is an adult individual who, at all relevant times, was responsible for hiring, screening, advising, supervising, disciplining,

2

and dismissing officers from the ATPD. Claims made herein against Defendant Bond are against him in his official capacity.

10.    Defendant **JOHN DOE POLICE OFFICERS 1-10** ("Defendant Officers") are adult individuals who, at all relevant times, were duly appointed and acting police officers of Defendant Township of Abington. Claims made herein against Defendant Officers are against them individually and in their official capacity as Abington Township police officers.

11.    At all times relevant to this Complaint, the Defendant Officers acted in concert and in conspiracy with one another to deprive Wyleek Tinsley of his constitutionally protected rights.

## OPERATIVE FACTS

12.    On March 6, 2025, Wyleek Tinsley was at an apartment located at the 2300 block of Rosemore Avenue in Abington Township. This apartment development was, at all relevant times, known as the Rosemore Gardens Apartments.

13.    On the above indicated date, Wyleek Tinsley was nineteen years old.

14.    At the time of the events giving rise to this lawsuit, Mr. Tinsley had recently begun a romantic relationship with Rachel Thomas, who, upon information and belief was thirty-four years old.

15.    Tinsely and Thomas met via social media and within just a matter of weeks the two began dating.

16.    After the two started dating, Mr. Tinsely would frequent the home at the Rosemore Apartments. During this time, Ms. Thomas had two of her children living at the apartment, including an eleven-year-old girl named M.C. and a younger son.

3

17. Tinsley had photographs on his phone which show him affectionately embracing Thomas' younger son.

18. The day before he was murdered by Defendants, Tinsley had contacted his ex-girlfriend, asking for a ride to leave Ms. Thomas' home. This infuriated Ms. Thomas, who grabbed the phone out of Mr. Tinsley's hand and had harsh words for the ex-girlfriend.

19. .

20. At all relevant times, Ms. Thomas owned a firearm which was present in the aforementioned apartment at Rosemore Gardens.

21. On the morning of March 6, 2025, Mr. Tinsley was present at the aforementioned apartment, along with Ms. Thomas and M.C.

22. Sometime before 11:00 A.M., M.C. called 9-1-1 and advised that there was an argument in the apartment between Ms. Thomas and Mr. Tinsley in the bedroom of the apartment. M.C. was in a different room and did not know what was going on in the bedroom occupied by Mr. Tinsley and Ms. Thomas, but M.C. did tell the 9-1-1 operator that M.C. had heard a gunshot.

23. In response to M.C.'s 9-1-1 call, Defendant Abington Township deployed over a dozen police officers with high powered assault rifles, riot gear including shields, and other advanced and lethal tactical equipment.

24. The 9-1-1- operator advised M.C. to discreetly leave the second-floor apartment and meet the Abington Police outside when they arrived at the Rosemore Apartments.

25. Before going outside to meet with the police, M.C called out towards the room where her mother was, stating that she was going downstairs to walk the dog. This appears to

have been said intentionally to avoid alerting her mother that she was, in fact, going to speak with law enforcement.

26.     The above statement was overheard by police dispatch and should have indicated that the 11-year-old did not believe she was in immediate danger, or it is unlikely she would have felt comfortable announcing her intention to go outside.

27.     Additionally, her decision to provide an explanation for leaving the house should have signaled that she did not believe her mother was injured or in distress. Had she perceived her mother to be harmed, it is unlikely she would have prioritized offering a casual reason for her departure.

28.     When police arrived, they immediately found M.C., placed the 11-year-old in the back of a police car and began to question her about what was going on in the apartment.

29.     M.C. repeated that she did not know what was going on in the bedroom. She also provided contact information for Ms. Thomas. Police attempted to call the number given by M.C., but there was no answer.

30.     At all relevant times, Abington police had no information about what was happening in the second-floor apartment occupied by Ms. Thomas and Mr. Tinsley.

31.     Abington police ascertained the first name of Wyleek and then began searching for his phone number in an attempt to call him.  This took several minutes and ended in a failed attempt to locate him through police database.

32.     At some point between when the police were at the scene, and before they entered the apartment, Mr. Tinsley called his father. During this call, it was clear to Mr. Tinsley's father that Tinsley was upset and in a stressful situation. More importantly, Tinsley was requesting that his father come and pick him up right then from Ms. Thomas' apartment.

33.     Over a period of time, Abington township police, including Defendants John Doe Police Officers 1-10, positioned themselves around the exterior of the apartment building with significant firepower and other equipment. Other than the attempted phone calls and search of Wyleek Tinsley's phone number,  referred to in the previous paragraphs, Abington Township police officer, including Defendants John Doe Police Officers 1-10, did nothing else to obtain reliable information about what was going on in the apartment occupied by Ms. Thomas and Mr. Tinsley.

34.     During the period referred to in the previous paragraph, Abington township police, including Defendants John Doe Police Officers 1-10, made assumptions about what was happening in the apartment without making any effort to confirm whether or not those assumptions were true.

35.     Upon information and belief, Abington township police, including Defendants John Doe Police Officers 1-10, believed that Ms. Thomas was being held hostage by Mr. Tinsley, even though there was no evidence that was the case.

36.     Eventually a number of Abington township police, including some of Defendants John Doe Police Officers 1-10, went into the apartment building and positioned themselves around the bottom of a stairway that led up to the entrance of Ms. Thomas' apartment.

37.     While Abington township police, including Defendants John Doe Police Officers 1-10, were waiting for something to happen, what appeared to be a gunshot was heard coming from the apartment.

38.     The sound that appeared to be a gunshot was also heard over the phone by Mr. Tinsley's father, who had received a call from Tinsley asking to get picked upa, as described above.

6

39.     After hearing what appeared to be a gunshot, Abington township police, including Defendants John Doe Police Officers 1-10, burst into the apartment unit.

40.     With their hostage tactical gear, which included handheld shields and high-powered assault rifles.

41.     After kicking the unlocked door open, the officers turned the door handle to gain entry into the home due to the fact that the door slowly closed after the initial kick.

42.     Less than three seconds after entering the unit, Abington police officers, two of whom are among Defendants John Doe Police Officers 1-10, began firing their weapons while simultaneously shouting commands to freeze and place hands in the air  at an individual they saw at the end of a hallway from the apartment entrance, leaving no time to comply.

43.     Multiple shots were fired by at least two officers. Two shots were fired by officer 1 striking Wyleek Tinsely in the head, followed by multiple shots fired by the second officer.

44.     As a result of the above incident, Mr. Tinsley was shot several times. Although some life-saving efforts were attempted at the scene of the shooting, Mr. Tinsley died of his wounds.

45.     Ms. Thomas was removed from the bedroom where the gun was found neatly placed against the pillow.

46.     Wyleek Tinsley was unarmed when he was shot by Defendants.

47.     Wyleek Tinsley did not present a risk to anyone at the time of the shooting.

48.     Defendants did not provide Mr. Tinsley with any opportunity to cooperate, as they started shooting immediately upon seeing Mr. Tinsley in the hallway.

49.    At all relevant times, Wyleek Tinsley conducted himself as a reasonable individual who maintained a proper lookout for his safety and at no time assumed the risk of Defendants' conduct.

50.    As a direct result of the Defendants' conduct as set forth herein, Decedent Wyleek Tinsley was caused to suffer catastrophic and agonizing injuries of which he had conscious awareness prior to his death

**DAMAGES**

51.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the Individual Defendants and Abington Township caused Mr. Tinsley to be subjected to excessive deadly force, causing him to suffer multiple gunshot wounds, intense and unbearable pain and suffering that was experienced while Mr. Tinsley was conscious and aware, and fear of impending death and finally death, all without justification or provocation.

52.    As a direct result of Defendants' conduct and omissions, Mr. Tinsley sustained injuries and damages, including loss of freedom, loss of his youth, loss of his relationships with family members, pain and suffering, mental anguish, emotional distress, countless indignities, degradation, permanent loss of natural psychological development, loss of life's pleasures, and an excruciatingly painful death by multiple gunshots.

53.    As a direct result of Defendants' conduct and omissions, Mr. Tinsley sustained economic injuries and damages, including loss of income from the employment he would have maintained before his wrongful death.

54.    As a direct result of Defendants' conduct and omissions, Mr. Williams sustained physical injuries, including physical pain and suffering, personal injuries, and death.

8

## COUNT I – WRONGFUL DEATH
### All Plaintiffs v. All Defendants

55.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

56.     Plaintiff Jennifer Scarbarough as administrator of the Estate of Wyleek Tinsley, brings this action on behalf of the beneficiaries under and by virtue of the Wrongful Death Act, 42 Pa. C. S. § 8301, and the applicable Rules of Civil Procedure and decisional law.

57.     Wyleek Tinsley was nineteen years old at the time of his wrongful death. He was unmarried and had not fathered any children. His sole heirs at the time of his death were his parents:

   a.   Jennifer Scarbarough

   b.   Douglas Tinsley

## COUNT II – SURVIVAL
### Plaintiff v. All Defendants

58.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

59.     Plaintiff Jennifer Scarborough as the Administrator of the Estate of Wyleek Tinsley brings this Survival action on behalf of the Estate of Wyleek Tinsley and by virtue of 42 Pa. C. S. § 8302, and the applicable Rules of Civil Procedure and decisional law:

60.     The persons who are entitled to the Estate of Wyleek Tinsley are:

   a.   Jennifer Scarborough

   b.   Douglas Tinsley

## COUNT III – CIVIL RIGHTS VIOLATION

9

**Excessive Force / Fourth Amendment**
**Plaintiff v. Defendant Officers**

61.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

62.     Wyleek Tinsley did not physically resist or assault anyone at the time of the incident, including Defendant Officers.

63.     The actions of the Defendant Officers constituted excessive, unreasonable and unjustified force against Mr. Tinsley, and therefore violated his clearly established right to be free from excessive, unreasonable force and unreasonable search and seizure.

64.     Defendant Officers actually knew that shooting Mr. Tinsley, who was unarmed and unthreatening, had a substantial risk of causing serious injury and death.

65.     The actions of Defendant Officers in continuing to shoot at Mr. Tinsley was grossly inappropriate in light of the non-existent risk.

66.     The Defendant Officers recognized that their actions were wrong and presented a risk of sever bodily harm and death to Mr. Tinsley. Defendant Officers response to the knowledge noted above was so inadequate as to show deliberate indifference.

67.     The conduct of Defendant Officers in shooting the unarmed, innocent and unthreatening Mr. Tinsley, shocks the conscience and is fundamentally offensive to a civilized society.

68.     The actions of Defendant Officers amounts to callous, reckless, or deliberate indifference to the constitutional rights of Mr. Tinsley and caused him to suffer constitutional deprivation.

69.     The actions of Defendant Officers violated clearly established and well settled constitutional rights of Mr. Tinsley, including, but not limited to:

10

a. Freedom from the unreasonable seizures of his person; and

b. Freedom from the excessive, unreasonable and unjustified force against his person.

70. The acts of the Defendant Officers were done with reckless disregard of Tinsley's rights, or were grossly negligent, or were deliberately indifferent to the rights of Mr. Tinsley.

71. The acts of the Defendant Officers were committed maliciously, wantonly, willfully, without probable or reasonable cause, excuse, or justification, and done with reckless disregard and therefore warrant the imposition of exemplary and punitive damages in addition to compensatory damages.

72. As the result and proximate cause of the excessive use of force by Defendant Officers, Mr. Tinsley suffered emotional distress, humiliation, embarrassment, and other injuries including death, damages, and losses.

73. There is an affirmative causal link between the actions of Defendant Officers and the particular injuries and losses suffered by Mr. Tinsley.

74. The Defendant Officers are liable for infliction of excessive, unreasonable force and infliction of unreasonable seizure, in violation of Mr. Tinsley's clearly established rights under the Fourth Amendment, and applied to state actors by the Fourteenth Amendment, to the United States Constitution, through 42 U.S.C. § 1983, to be free from infliction of excessive, unreasonable force, and unreasonable seizure.

75. As a direct and proximate result of the said acts of the Defendant Officers, Decedent Wyleek Tinsley suffered damages, including but not limited to, the following:

a. violation of Decedent's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable seizure of his person and cruel punishment;

b. physical pain and suffering;

c. emotional trauma and suffering; and

d. death.

76. The Defendant Officers committed the above-described acts and/or omissions in violation of U.S.C. § 1983 and the United States Constitution by using an unreasonable amount of force on the body of Wyleek Tinsley.

### COUNT IV – CIVIL RIGHTS CONSPIRACY
### Plaintiff v. Defendant Officers

77. Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

78. The Officer Defendants, acting within the course and scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Tinsley of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, and excessive force by state actors.

79. In furtherance of the conspiracy, the Officer Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a. Going into a residential building with "guns blazing";

b. Intentionally and/or recklessly and with deliberate indifference shooting an unarmed man who presented no threat to any of them at any time;

80.     The Officer Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Tinsley's injuries and death.  Defendants knew, or should have known, that their conduct would result in sever and permanent injury and death to Mr. Tinsley.

**COUNT V – FAILURE TO INTERVENE**
**Plaintiff v. Defendant Officers**

81.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

82.     By their conduct and under color of state law, the Officer Defendants, acting within the course and scope of their employment with the Abington Township Police Department, had opportunities to intervene on behalf of Mr. Tinsley to prevent the wrongful use of excessive, unjustified and unconstitutional deadly force  against him, but with deliberate indifference, declined to do so.

83.     These Defendants' failures to intervene violated Mr. Tinsley's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer in 2025 would have believed that failing to intervene to prevent Defendants from using excessive, unjustified and unconstitutional deadly force on Mr. Tinsley, an unarmed man, were lawful acts.

84.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Tinsley's injuries.  The Officer Defendants knew, or should have known, that their conduct would result in Mr. Tinsley being severely injured and/or killed.

## COUNT VI – SUPERVISORY LIABILITY
### Plaintiff v. Defendant Molloy

85.    Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

86.    Defendant Officers acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Molloy, both in this case and as a matter of practice and custom.

87.    Defendant Molloy acted recklessly and with deliberate indifference to Mr. Tinsley's constitutional rights by failing to adequately train, supervise, and discipline the ATPD personnel that were involved in this incident, thereby allowing and causing these Defendant Officers to deprive Mr. Tinsley of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, and from excessive deadly force that deprived Mr. Tinsley of his liberty and life.

88.    Defendant Molloy directly supervised the investigative acts taken by the Defendant Officers.

89.    The reckless and deliberately indifferent conduct of Defendant Molloy violated his clearly established duty, in 2025, to supervise the Defendant Officers, and no reasonable police supervisor in 2025 would have believed that the reckless and deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

90.    Defendant Molloy's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Tinsley's injuries and death.  Defendant Molloy knew, or should have known, that his conduct would result in Mr. Tinsley being seriously injured and/or killed.

14

## COUNT VII – MUNICIPAL LIABILITY / *MONELL* CLAIM
### Plaintiff v. Defendant Township of Abington

91.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

92.     Defendant Abington Township, by and through its final policymakers, had in force and effect during the time that Mr. Tinsley was shot, and for many years preceding and following that incident, a policy, practice, or custom of unconstitutional misconduct in the use of excessive deadly force against unarmed individuals.

93.     Final policymakers for Defendant Abington Township had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into the use of excessive deadly force against unarmed individuals.

94.     Mr. Tinsley's injuries, damages and death were further proximately caused by policies and practices on the part of policymakers with responsibility of administration of the Abington Township Police Department to allow the use of excessive deadly force against unarmed individuals.

95.     The widespread practices described in the preceding paragraphs, of which Defendant Abington Township had actual or constructive notice, were allowed to flourish because the Police Department declined to implement sufficient training and/or any legitimate mechanisms for oversight or punishment.

96.     Such unconstitutional municipal customs, practices, and/or policies were the moving force behind the unjustified and unconstitutional use of deadly force against Wyleek Tinsley when he was unarmed and presented no threat to anyone, as well as all the other injuries and damages set forth above.

## PUNITIVE DAMAGES

97.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

98.     The conduct of the Officer Defendants was outrageous, malicious, wanton, willful, reckless, and intentionally designed to inflict harm upon Decedent.

99.     As a result of the acts of the Defendants alleged in the preceding paragraphs, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiffs request the following relief:

(a)     That the Court award compensatory damages to Plaintiffs and against all Defendants, jointly and severally, in an amount to be determined at trial;

(b)     That the Court award punitive damages to Plaintiffs, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

(c)     A declaratory judgment that the practices and policies complained of are unconstitutional;

(d)     For pre-judgment and post-judgment interest and recovery of Plaintiffs' costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

(e)     For such other and further relief as appears reasonable and just.

MARRONE LAW FIRM, LLC


By:     s/ Michael D. Pomerantz
        Joseph M. Marrone, Esquire
        Michael D. Pomerantz, Esquire

16

Attorneys for Plaintiffs
200 South Broad Street, Suite 610
Philadelphia, PA  19102
(215) 732-6700
jmarrone@marronelaw.com
PA Atty ID# 64920
mpomerantz@marronelaw.com
PA Atty ID# 83415

Date: June 2, 2024