### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER SCARBOROUGH, as Executor of the Estate of Wyleek Tinsley, Deceased, <br><br> *Plaintiff,* <br><br> v. <br><br> TOWNSHIP OF ABINGTON, et al., <br><br> *Defendants.* | CIVIL ACTION <br> NO. 25-2823 |

**Pappert, J.**                                                    **April 27, 2026**

### MEMORANDUM

On March 6, 2025, the Montgomery County 911 dispatcher received a call from M.T., a young girl who said her mother's boyfriend had a gun and shot at her mother inside their apartment at the Rosemore Garden Apartments in Glenside. Abington Township Police responded and the child, who had left the apartment under the guise of taking her dog outside, told police the boyfriend, Wyleek Tinsley, fired a gun inside. M.T. wasn't sure if her mother, Rachel Thomas, was hurt.

A police response team led by Sergeant Daniel Burgmann and including Officer Thomas Nyman formed in the stairwell leading to the apartment, where they heard yelling and screaming from the girl's mother. They were instructed to enter the apartment if they heard another scream. They instead heard a gunshot. Fearing Ms. Thomas was wounded or dead, they immediately entered the apartment and encountered Mr. Tinsley emerging from a bedroom into the end of a dimly lit hallway, turning to face them and raising his hands upward from near his waist. Believing he

1

had fired a gun just seconds before the encounter and he was now preparing to shoot them, Sergeant Burgmann and Officer Nyman fatally shot Mr. Tinsley. He was unarmed. Burgmann went into the bedroom to find Ms. Thomas crouched against the wall on the other side of the bed, uninjured. When Burgmann asked Ms. Thomas where the gun was, she responded "I don't know, he had it." Burgmann then saw the gun on the bed.

Jennifer Scarborough, as executor of her son Wyleek Tinsley's estate, alleges the two officers used unconstitutionally excessive force and brings related federal and state law claims against the officers, Abington Police Chief Patrick Molloy and the Township of Abington. The defendants move for summary judgment. After thoroughly reviewing the record to include audio of the 911 call and officer body worn camera footage, considering the parties substantial briefing and holding oral argument, the Court grants the motion. Under the totality of the circumstances, Sergeant Burgmann and Officer Nyman reasonably believed Tinsley posed a significant threat of death or serious physical injury when they used deadly force against him.

I

A

When M.T. called 911 to report the domestic dispute between Tinsley and her mother, she told the dispatcher he "just shot a gun at her" mother. She didn't know if her mother was hurt. (911 Call, at 00:05–14, Defs.' Statement of Material Facts Ex. A., Dkt. No. 61-2.) An argument is audible in the background of the 911 call recording. *See* (*id.*) When the dispatcher asked if the dispute was verbal or physical, M.T. explained she "heard a gunshot" and "a door got broken down." (*Id.*, at 1:15–22.) The

2

dispatcher asked if Tinsley "had a gun on him" and M.T. replied "yes, I believe so, I just heard it, I am not in the room." (*Id.*, at 1:43–50.) The dispatcher prompted M.T. to leave the apartment, if she could. M.T. then called out that she was taking the dog outside and left to meet responding police officers. (*Id.*, at 2:49–3:21.)

B

Officer Chris Petras and Burgmann and Nyman were among the officers who responded to the reported domestic incident. (Burgmann, Nyman and Petras Body-Worn Camera Footage, Defs.' Statement of Material Facts Exs. B, C & D, Dkt Nos. 61-3–5.) When Officer Nyman arrived, he got out of his car, beckoned M.T. to meet him and asked her to confirm the location of the apartment she had just left, which she quickly did. They moved away from the apartment building together and joined Officer Petras. (Nyman BWC, at 2:34–3:12, Dkt. No. 61-4.) M.T. calmly told Officers Petras and Nyman she "was on a virtual class and heard [her] mom and her boyfriend fighting," she heard a gunshot and "didn't know what happened after that." (Petras BWC, at 3:06–20, Dkt. No. 61-5.) Officer Petras asked for M.T.'s mother's phone number and made the first of several unsuccessful attempts to contact the woman inside the apartment. (*Id.*, at 3:25–4:12.) M.T. then confirmed she heard one gunshot and added that her mother was crying. (*Id.*, at 4:15–26.) She gave a physical description of Tinsley, confirmed again that she believed he fired a gun and explained she was not sure if he fired it at her mother. (*Id.*, at 4:26–5:03.) Officer Petras brought M.T. to his squad car where he tried to gather more information on Tinsley and Rachel Thomas. *See* (*id.*, at 5:55–10:00.)

C

Meanwhile, a group of officers established a perimeter around the apartment. (Nyman BWC, at 7:07.)  An officer reported over the radio he saw blinds closing over a window in the apartment.  (*Id.*)  Sergeant Burgmann and Officer Nyman convened inside the apartment building stairwell as part of a "Quick Response Team." (Burgmann BWC, at 7:28); (Nyman BWC, at 8:10); (Nyman Dep. at 86:05–10, Pl.'s Resp. to Defs.' SOMF Ex. I, Dkt. No. 79-9.)  While in the stairwell, Burgmann reported over the radio that he heard a "female yelling inside the apartment," (Burgmann BWC, at 8:50–8:54), and roughly one minute later that he heard "screaming again from the female," (*Id.,* at 9:44–59).  An officer outside issued an order over the radio that officers in the stairwell should enter the apartment if they heard more screaming.  Burgmann relayed that order to his fellow officers.  He instructed that two officers with lethal weapons would enter first (Burgmann and Nyman) followed by an officer with a "less lethal" firearm.  He told officers in the stairwell that if Tinsley did not comply or tried to move, to "hit him."  (*Id.*, at 11:56–12:26.)

Officers in the stairwell then heard a single gunshot from inside the apartment. (*Id.*, at 14:57); (Burgmann BWC, at 14:19.)  Believing Ms. Thomas had just been shot and was dead or critically injured, Sergeant Burgmann kicked the door three times before it opened into the living room of the apartment.  (Burgmann BWC, at 14:32); (Burgmann Dep., at 98:1–7, 130:12–17.)  Burgmann immediately shouted "police show me your hands"—at this point, he couldn't see anyone in the living room.  (Burgmann BWC, at 14:33–34.)  He moved further into the room and saw a figure standing at the threshold of a doorway on the left end of a dimly lit hallway.  (*Id.*, at 14:35.)  Sergeant

4

Burgmann's body worn camera shows Tinsley backed out of a room into the hallway, his body perpendicular to it, with his left shoulder oriented toward Sergeant Burgmann.  (*Id.*)  As Tinsley turned to face the approaching officers, he moved his hands upward from near his waist.  (*Id.*, at 14:36.)  Believing Tinsley was about to shoot him or other officers, Sergeant Burgmann fired two shots from his service rifle at Tinsley and then moved past the hallway entrance further into the living room to a safer position.  (*Id.*); (Burgmann Dep. at 97:15–19.)  Officer Nyman, next to Burgmann, fired his service handgun at Tinsley ten times.  (Nyman BWC, at 14:35–37); (Montgomery Cnty. Detective Bureau Suppl. Rep. at 5, Dkt. No. 79-5.)  Approximately eight seconds elapsed between the moment Burgmann opened the door to the apartment and when he fired the first shot.  (Burgmann BWC, at 14:32–40.)  Burgmann's first shot and Nyman's last were separated by approximately four seconds.  (*Id.*, at 14:36–40.)

Immediately after discharging their firearms, Burgmann and Nyman moved down the hallway.  (*Id.*, at 14:45–51); (Nyman Dep., at 147:11–15.)  Sergeant Burgmann entered the bedroom, confirmed Ms. Thomas was uninjured, saw a handgun on the bed and ushered her out of the room and into the hallway.  (Burgmann BWC, at 14:51–15:53.)  While escorting her out of the apartment, Burgmann told Thomas not to touch anything, but she bent down and picked up a cell phone from the floor of the hallway where Tinsley had been shot.  (*Id.*)  Officer Nyman began to administer medical aid to Tinsley before their supervisor, Lieutenant Kent, removed both Burgmann and Nyman from the apartment.  (Nyman BWC, at 16:56 & 17:31.)  Tinsley was shot five times—in the left side of his stomach, his right inner thigh, his left inner

calf, the left side of his head and the top of his head. (Dist. Att'y's Apr. 14, 2025 Rep. at 3, Dkt. No. 64.)

### D

Jennifer Scarborough sued the Township of Abington, Abington Police Chief Patrick Molloy and "John Doe" police officers. (Compl., Dkt. No. 1.) She amended her complaint to name Sergeant Burgmann and Officer Nyman as defendants. (Am. Compl., Dkt. No. 51.) She asserts wrongful death and survival against all defendants, (Counts I & II), Fourth Amendment excessive force, civil rights conspiracy and failure to intervene claims against Sergeant Burgmann and Officer Nyman, (Counts III–V), supervisory liability against Chief Molloy, (Count VI), failure to train against the Township of Abington, (Count VII), state law assault, battery and gross negligence against Sergeant Burgmann and Officer Nyman, (Counts VIII–X), and gross negligence against Chief Molloy and the Township of Abington, Count XI).[1] Defendants now move for summary judgment on all claims against them. (Dkt. No. 60.)

### II

Federal Rule of Civil Procedure 56 directs a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This language compels summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A nonmoving party has not made that sort of showing if "the

---

[1] Plaintiff's counsel withdrew both gross negligence claims at oral argument. (Tr. of Oral Arg., at 103:16–21, Dkt. No. 86.)

record taken as a whole could not lead a rational trier of fact to find" in the party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation omitted). The party must identify "specific facts, as opposed to general allegations," establishing each element. 10A *Wright & Miller's Federal Practice and Procedure* § 2727.2 (4th ed. 2026).

Scarborough may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). She "cannot resist a properly supported motion for summary judgment merely by restating the allegations of [her] complaint; rather, [s]he must point to concrete evidence in the record that supports each and every essential element of [her] case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (per curiam) (citing *Celotex*, 477 U.S. at 322). "Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109–10 (3d Cir. 1985). Where there is no genuine issue of material fact, "concerns regarding the credibility of witnesses cannot defeat summary judgment." *Schoonejongen v. Curtiss-Wright Corp.,* 143 F.3d 120, 130 (3d Cir. 1998).

## III

Section 1983 allows plaintiffs to sue state actors who violate their federal constitutional rights. 42 U.S.C. § 1983. Qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). The doctrine "gives ample room for mistaken judgments" and protects "all but the plainly incompetent or those who

knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam) (citation omitted).  To determine whether an officer is entitled to qualified immunity, the Court asks whether (1) "taken in the light most favorable to the party asserting the injury" the facts "show the officer's conduct violated a federal right" and (2) "the right was clearly established at the time of the [alleged] violation." *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam) (citation modified and omitted).  The first question— whether any officer violated a constitutional right—"overlaps with the merits of the [excessive force] liability determination." *Est. of Paone v. Plymouth Township*, No. 22-2178, 2024 WL 5107592, at *4 (E.D. Pa. Dec. 13, 2024), *aff'd*, No. 25-1029, 2026 WL 661978 (3d Cir. Mar. 9, 2026).

## A

The Fourth Amendment's "objective reasonableness" standard governs excessive force claims.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  Deadly force is not excessive when an officer reasonably believes "the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).  The inquiry requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue" and "whether the suspect poses an immediate threat to the safety of the officers or others."[2]  *Graham*, 490 U.S. at 396.  Reasonableness "must be judged from the perspective of a reasonable

---

[2]    "The following factors guide our analysis: (1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, . . . (3) whether the suspect attempts to resist arrest or flee the scene[,] (4) the possibility that the persons subject to the police action are themselves violent or dangerous, (5) the duration of the action, (6) whether the action takes place in the context of effecting an arrest, (7) the possibility that the suspect may be armed, and (8) the number of persons with whom the police officers must contend at one time." *Saintil v. Borough of Carteret*, No. 22-2898, 2024 WL 3565308, at *8 n.16 (3d Cir. July 29, 2024) (citations and internal quotation marks omitted) (cleaned up).

officer on the scene, rather than with the 20/20 vision of hindsight," and must "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 396–97. Prior events may contextualize officers' perception of otherwise ambiguous conduct as threatening. *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025). "[A]n officer who uses deadly force in the mistaken belief that a suspect is armed" does not violate the Constitution "so long as the mistake is reasonable and the circumstances otherwise justify the use of such force." *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011).

"Reasonableness under the Fourth Amendment should frequently remain a question for the jury," *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (citation omitted), and courts should be "cautious" at summary judgment in deadly-force cases "to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict [his] story—the person shot dead—is unable to testify," *Lamont*, 637 F.3d at 181–82. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). When material facts are not in dispute, and all inferences have been drawn in favor of the nonmoving party "*to the extent supportable by the record*," reasonableness "is a pure question of law." *Id.* at 381 n. 8 (emphasis in original).

## B

No reasonable jury could find Sergeant Burgmann and Officer Nyman used excessive force against Tinsley. Officers responded to a 911 call where a witness, M.T.,

reported a domestic dispute. Officers' response to a domestic dispute is a "specific factor relevant to the totality of circumstances," *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (citation omitted), because "the volatility of situations involving domestic violence" makes them "particularly dangerous" for officers, *Mattos v. Agarano*, 661 F. 3d 433, 450 (9th Cir. 2011) (en banc) (citation omitted); *see also United States v. Rahimi*, 144 S. Ct. 1889, 1906 (2024) (Sotomayor, J., concurring) ("[O]ne study found that domestic disputes were the most dangerous type of call for responding officers, causing more officer deaths with a firearm than any other type of call." (citation omitted)).

The young girl explained several times—during her 911 call and on-site interviews with officers—that she believed Tinsley fired a gun in the apartment. *See generally* (911 Call; Petras BWC.) While waiting in the stairwell, officers heard a female voice "screaming" and "yelling." (Burgmann BWC, at 8:50–9:59.) Then they heard a gunshot.[3] (*Id.*, at 14:19.) At that moment any officer on the scene would have reasonably believed—indeed would have known—someone inside the apartment was armed and had just fired the weapon. "The possibility that a suspect may be armed," whether a suspect "poses an imminent threat to the safety of the police or others in the vicinity" and "the possibility that the persons subject to the police action are themselves violent or dangerous" are three of the several factors courts consider in determining reasonableness of force. *Saintil v. Borough of Carteret*, No. 22-2898, 2024 WL 3565308,

---

[3] Scarborough initially disputed whether officers heard a gunshot from inside the apartment. (Pl.'s Resp. to SOMF ¶ 27) ("[A] loud noise was heard coming from the direction of the apartment."). At oral argument counsel granted it was "reasonable to believe that [the officers] heard a gunshot," (Tr. of Oral Argument at 32:6–8, Dkt. No. 86), a sensible concession since the body worn camera footage permits no other inference, s*ee Scott*, 550 U.S. at 380.

at *8 n.16 (3d Cir. July 29, 2024).  "The immediacy of the threat posed by the suspect is the most important factor."  *Gonzalez v. Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (en banc).  Any reasonable officer on the scene would believe Mr. Tinsley posed an immediate, mortal threat to Ms. Thomas.  This is why Sergeant Burgmann and Officer Nyman, upon hearing the gunshot, quickly entered the apartment.  (Burgmann Dep., at 98:1–7, 130:12–17 ("[O]ur goal was to get to the hostage that we believed was shot and . . . either dead or critically injured.")).  After Sergeant Burgmann kicked the door open, he yelled "police, show me your hands" and seconds later encountered Tinsley at the end of a dimly lit hallway, turning toward him and moving his hands upward from near his waist.  (Burgmann BWC, at 14:33–36.)  He fired twice and Officer Nyman, next to him, fired ten times.  (Burgmann Dep., at 97:15–19); (Montgomery Cnty. Detective Bureau Suppl. Rep. at 5.)

Roughly twenty seconds passed between the gunshot the officers heard from the stairwell and Officer Nyman's last shot.  (Burgmann BWC, at 14:19–40.)  Although "courts [] consider the speed with which officers resort to force" because officers are expected to "use force with measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance," *Solis v. Sarrett*, 31 F.4th 975, 983 (5th Cir. 2022) (citation omitted), "law enforcement officers are not afforded the opportunity of viewing in slow motion what appears to them to constitute life-threatening action," *Dooly v. Tharp*, 856 F.3d 1177, 1182–83 (8th Cir. 2017).  When Tinsley appeared at the end of the dimly lit hallway moving his hands upward from near his waist after presumably firing a gun seconds earlier, the officers reasonably believed they faced a deadly threat.  "The Constitution simply does not require police to

11

gamble with their lives in the face of a serious threat of harm." *Elliott v. Leavitt*, 99 F.3d 640, 641 (4th Cir. 1996). "Waiting in such circumstances could well prove fatal. Police officers do not enter into a suicide pact when they take an oath to uphold the Constitution." *Lamont,* 637 F.3d at 183.

1

Scarborough responds by misrepresenting the record, claiming

> Prior to entering the residence and shooting Mr. Tinsley, the Defendant officers only knew that the juvenile standing outside of the building was the 911 caller, there was a female inside the apartment, the basic description of the male, there was a reported domestic incident, and that the caller reported that a firearm was inside the apartment.

(Pl.'s Resp. in Opp'n at 16, Dkt. No. 77.) In addition to telling the 911 dispatcher Tinsley "just shot a gun at" her mother, M.T. told officers he fired a gun in the apartment, not that a "firearm was inside the apartment." (Petras BWC, at 4:40.) Scarborough argues the officers "had an abundance of information and time to evaluate the perceived threat" and "operated under an abundance of assumptions of their own creation," presumably suggesting they could have taken a different approach to deescalate the domestic dispute. (Pl.'s Resp. in Opp'n at 14–15.) Sergeant Burgmann and Officer Nyman did not have an "abundance of information and time to evaluate the perceived threat." They knew they were entering an unsettled, dangerous situation where their lives would be at risk. *See Graham*, 490 U.S. at 396–97. Second-guessing the officers' tactical approach relies upon the 20/20 hindsight courts cannot employ. *Id.*

Scarborough argues *Lamont* is distinguishable because there, "officers had an abundance of time to give the suspect commands, analyze the situation, and evaluate the suspect and his movements prior to making the determination that he presented them with imminent threat to their safety requiring them to use deadly force." (Pl.'s

12

Resp. in Opp'n at 14–15.)  She argues the case is "neither instructive nor analogous to the facts in this case." (*Id.* at 14.)  First of all, only the rare deadly force case is a factual match to another, and "in the end we must still slosh our way through the factbound morass of 'reasonableness'" because "all that matters is whether [the officers'] actions were reasonable." *Scott*, 550 U.S. at 383.  Furthermore, the facts and principles explained in *Lamont* are indeed instructive here.  In that case, officers pursued a suspected car thief through "dark and dense" woods, catching up with him in a thicket.  Lamont, 637 F.3d at 180.  The suspect was standing at an angle and suddenly pulled his hand out of his waistband.  Officers responded to his sudden movement by shooting him.  *Id.*  The Third Circuit Court of Appeals found the District Court correctly determined the officers' initial use of force was permissible because they "reasonably believed [the suspect] was drawing a gun, not complying with their command that he show his hands" when he suddenly pulled his hand from his waistband.  *Id.* at 183–84, 188.  Here, Sergeant Burgmann and Officer Nyman reasonably believed Tinsley possessed a gun, had fired it moments before and was thus likely to fire it at them before they encountered him in a dimly lit hallway raising his hands upward from near his waist.  Just as in *Lamont*, the officers here were not "constitutionally required to wait until [they] set[] eyes upon a weapon before employing deadly force to protect [themselves] against a . . . suspect who . . . moves as though to draw a gun." *Id.* at 183 (quoting *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001)).

Scarborough next claims defendants "avoid grappling with case law" where courts denied summary judgment so a jury could conduct a "sound factual analysis."

13

(Pl.'s Resp. in Opp'n at 15) (citing *Ardo v. Pagan*, 652 F. Supp. 3d 545 (E.D. Pa. 2023)). She says "the court did not grant summary judgment" in *Ardo* "because of the voluminous factual record that needed the consideration of a jury." (*Id.*) That is not true. The key issue in *Ardo* was the genuine dispute over whether officers "engaged in unreasonable behavior" that may have "proximately caused" their use of deadly force. *Ardo*, 652 F. Supp. 3d at 558. The officers there responded to a man in mental health crisis who threatened to light an explosive attached to his neck if he saw any officers. *Id.* at 552, 559. The court explained the officers "immediately drew their weapons" "despite knowing that they were dealing with an emotionally disturbed person," "did not perform any de-escalation techniques," "ordered [the decedent] to get out of his vehicle" "despite knowing [he] likely had an explosive device," and "neglected to take cover behind their patrol cars, but instead approached the vehicle" while issuing "competing demands" before shooting him. *Id.* at 558–59. This, the court concluded, was enough for a jury to find the officers acted unreasonably in the minutes preceding their use of force. *Id.* at 560. While Scarborough does not mention any of these facts or the court's reasoning in *Ardo*, to the extent she contends Sergeant Burgmann and Officer Nyman acted unreasonably in the minutes before they heard a gunshot from within the apartment, her claim finds no support in the record. Even if it did, the gunshot officers heard from inside the apartment was the "superseding cause" of the violence that followed. *See Lamont*, 637 F.3d at 185 (citing *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995) (Alito, J.)).

14

2

Scarborough next argues "the extremely short timeframe between the officers' command and the discharge of twelve rounds raises an additional substantial question as to whether the officers ever conducted the objective threat assessment required by the Fourth Amendment." (Pl.'s Resp. in Opp'n at 17.)  She misstates the law.  The Fourth Amendment does not require officers to conduct an "objective threat assessment."  It prohibits deadly force unless an officer reasonably believes "the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3.  The gravamen of Scarborough's argument is that officers should have given Tinsley more time to comply with their command.

"While an officer is not obligated in all circumstances to give a warning before using force, whether proper warnings were given is a pertinent consideration in determining the reasonableness of the use of force."  1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 3.12[D] at 3-579 (4th ed. 2024); *see also Garner*, 471 U.S. at 11–12 ("[D]eadly force may be used to prevent escape, and if, *where feasible*, some warning has been given.") (emphasis added).  Here, Sergeant Burgmann gave a warning.  His and Officer Nyman's actions after the warning cannot be viewed in a vacuum.  *Barnes*, 145 S. Ct. at 1358.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396–97.  "[I]f the officer believes the suspect has a gun, the calculation changes—even if there was never, in fact, a gun."  *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023).

15

Burgmann and Nyman heard a gunshot coming from inside the apartment seconds before they encountered Tinsley at the end of the hallway. They already believed Tinsley had a gun and had previously fired it, possibly harming or killing Ms. Thomas. Based on these and other circumstances, they reasonably believed he would shoot again. When Tinsley turned toward them and raised his hands upward from near his waist, the officers reasonably believed he posed a threat of death or serious physical injury. Indeed, "[a]ny reasonable officer in [their] position would have imminently feared for [their] safety and the safety of others." *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001); *see also id.* ("[A]n officer does not have to wait until a gun is pointed at him before he is entitled to take action."). The suddenness and short duration of the encounter, in the context of what the officers knew before they entered the apartment, makes their use of force more reasonable, not less.[4] *See McVae v. Perez*, 120 F.4th 487,

---

[4] At oral argument, the Court gave Scarborough permission to file a supplemental brief in support of her conspiracy claim, which had by then morphed into something that was never pled. (Tr. of Oral Arg., at 86:10–22.) She used most of that filing to instead reargue the excessive force and qualified immunity issues, in which she came up with a new argument that "each trigger pull constitutes a separate Fourth Amendment event that must be independently justified by objective facts existing at that precise moment." (Pl.'s Suppl. Reply at 2, Dkt. No. 88.) Scarborough waived this argument given her failure to raise it in response to defendants' motion for summary judgment. *See United States v. Cruz*, 757 F.3d 372, 387–88 (3d Cir. 2014) (deeming waived "arguments that were raised for the first time in a Reply brief.").

In any event, the reasonableness inquiry is not limited to the "precise moment" of force, instead the Court must consider the totality of the circumstances. *Barnes*, 145 S. Ct. at 1358. Burgmann's two shots and Nyman's ten were fired in rapid succession over four seconds and constitute a single use of force. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (concluding fifteen gunshots fired in rapid succession were a single use of force). "[I]f police officers are justified in firing at a suspect in order to end a severe threat," as they were in this case, "the officers need not stop shooting until the threat has ended." *Id.* Burgmann and Nyman had no chance to re-assess the situation in the roughly four seconds between their first and last shot. *See Jones v. Treubig*, 963 F.3d 214, 236 (2d Cir. 2020) (emphasizing courts should not "isolate a particular act of force by an officer if it was intertwined with other acts of force in rapid succession where there was no reasonable opportunity to re-assess.").

Importantly, there is no evidence that any of the shots Burgmann or Nyman fired struck Tinsley in the back. *Compare Lamont*, 637 F.3d at 184 (finding continued use of force excessive when "11 of the 18 bullets that struck [the suspect] hit him from behind" and officers "fired continuously for ten seconds, shooting a total of 39 rounds"); *and Duvall v. Hustler*, 447 F. Supp. 3d 311, 326, 329 (E.D. Pa. 2020) (finding force excessive where nine officers fired 109 rounds, twelve of

16

493 (5th Cir. 2024) ("[D]issect[ing] events that occurred in less than 2.5 seconds is the 'sort of Monday morning quarterbacking' that our precedent proscribes."). Officers reasonably believed Tinsley was raising a gun, not complying with their command. *See Lamont*, 637 F.3d at 184 ("Given the state of the record, we are compelled to hold that the troopers reasonably believed that [the decedent] was drawing a gun, not complying with their command that he show his hands.").

3

Next, Scarborough claims Sergeant Burgmann contradicted his own account of the incident, "making it impossible for a judge to rely" on his descriptions of Tinsley "as an imminent threat to officer safety." (Pl.'s Resp. in Opp'n at 18.) She contends "Burgmann initially reported in his statements to Montgomery County Detectives that Tinsley was advancing toward officers in a shooting stance while pointing or about to point a firearm." (*Id.*) (citing "Intv. of Def. Burgmann, 3/11/2025.") First of all, there is no "Interview of Defendant Burgmann" in the record—Scarborough apparently refers to Montgomery County Detective Mark Minzola's March 11 interview with Officer Nyman. (Nyman Interview, Dkt. No. 79-8.) Detective Minzola asked Nyman "what happened once you got inside the apartment?" (*Id.* at 9.) He responded

> [W]e got inside the apartment. [W]e're facing a . . . long hallway towards the end of the house . . . it was dimly lit, there was nobody there and then all of a sudden . . . a person popped out of the . . . very last room on the left hand side towards us. [He] came in towards us . . . had his arms here and then had them up . . . in front of him, like, he was in a . . . shooting type stance, an offensive posture and started to move, like, towards us. [T]hat's when . . . I was obviously scared and deemed that to be a threat and I did not wanna get shot so I . . . shot him.

---

which hit the suspect from behind and two struck the soles of the suspect's feet, and where officers "inexplicabl[y]" testified they saw and heard the suspect fire a gun when it was "undisputed that no gun or other weapon was recovered near [the suspect].").

(*Id.* at 10) (cleaned up).  This response, Scarborough argues, conflicts with Burgmann's

deposition testimony:

> Q:  All right.  So at this point, there is no movement of his feet when he has—when you are saying what you believed that his hands are coming toward you, there is no movement of his feet at this point?
> A:  No, because at that time I shot him.
> Q:  Got you.
> A:  So by the time that he turned squared with me and pulled his hands up, shots were fired and there was no longer, there was no more movement.

(Burgmann Dep. at 199:3–11.)[5]  Setting aside Scarborough's misattribution of Officer

Nyman's interview response to Sergeant Burgmann the Court discerns no meaningful

inconsistency between the two responses.

Scarborough next claims Sergeant Burgmann's "initial, contemporaneous

statement—captured on body camera—does not mention any object [in Tinsley's

hands]."  (Pl.'s Suppl. Reply at 4, Dkt. No. 88.)  After Burgmann and Nyman left the

apartment with Lieutenant Kent immediately after the shooting, Kent asked the two

officers "Did you see a weapon?  What happened?"  Sergeant Burgmann responded,

"[Tinsley] came out of the bedroom, started coming up with his hands like this

[motions], there was already a shot fired, [I] moved to cover, as we were coming and he

was going like this [motions] bringing his hands up in a firing position."  (Nyman BWC,

at 19:12–19:25.)  Officer Nyman then turned off his body worn camera.  (*Id.*); *see also*

---

[5]      In addition to mistakenly attributing Officer Nyman's interview answer to Sergeant Burgmann, plaintiff's counsel mischaracterizes Burgmann's testimony to read:
> Q: At this point there is no movement of his feet when you say his hands were coming toward you?
> A: No, because I shot him.
> Q: So there was no movement of his feet?
> A: By the time he turned squared with me and pulled his hands up, shots were fired and there was no longer any movement.

(Pl.'s Resp. in Opp'n at 18.)  The differences are meaningful.  Counsel omitted the qualifier "you believed" from her question and omitted "at that time" from Burgmann's response.

18

(Burgmann Dep. at 104:16–20) ("Q: would the [debriefing] be taped at all or captured on any kind of body cam? A: No. I believe, per policy, we're told you are supposed to turn your body camera off for the public safety debriefing."). There is no material inconsistency in Sergeant Burgmann's account of the incident—while it is true that he did not mention an object in Tinsley's hands, his response is consistent with a reasonable belief that Tinsley was armed.

Even if Burgmann's statements could be construed as inconsistent, his "subjective beliefs and motivations are irrelevant[,]" "[w]hat is important is the amount and quality of the information known to [him] at the time he fired the weapon." *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018) (citation omitted); *see also Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."). And regardless, inconsistencies go to Sergeant Burgmann's credibility and do not alone create genuine issues of material fact. *See Schoonejongen,* 143 F.3d at 130 ("[C]oncerns regarding the credibility of witnesses cannot defeat summary judgment" where there is no genuine issue of material fact).

Scarborough's accusation of "inconsistencies" highlights the parties' dispute about whether Tinsley held an object in his hand when Burgmann and Nyman shot him. (Defs.' SOMF ¶¶ 36–39); (Pl.'s Resp. to Defs.' SOMF ¶¶ 36–39.) But this is all immaterial to whether reasonable officers in their position would have perceived Tinsley as a threat given the totality of the circumstances. *See Graham*, 490 U.S. at 386 (explaining reasonableness "must be judged from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight"); *see also Wilson v. Bastrop*, 26 F.4th 709, 714 (5th Cir. 2022) ("This possible lacuna in [the officer's] testimony is immaterial to the constitutional issue.  Even assuming [the decedent] did not point a gun at [the officer's] squad car, the undisputed facts still justified the exercise of lethal force.").  "Also irrelevant is the fact that [Tinsley] was actually unarmed."  *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991).  Officers need not wait to see a weapon before using deadly force to protect themselves when they reasonably believe they face a deadly threat.  *Thompson*, 257 F.3d at 899.

On this record, the officers reasonably believed Tinsley had a gun and turned to point it at them.  *See Lamont*, 637 F.3d at 182 ("[T]he party opposing summary judgment in a deadly-force case must point to evidence—whether direct or circumstantial—that creates a genuine issue of material fact, 'and may not rely simply on the assertion that a reasonable jury could discredit the opponent[s'] account.'") (citation omitted); s*ee also Goode v. City of Philadelphia*, 776 F. App'x 80, 84–85 (3d Cir. 2019) (finding "several disputed and purportedly material facts" immaterial to the reasonableness of officers' use of force).  Under the totality of the circumstances the officers faced, their conduct is the quintessential "split-second judgement" the Court will not second guess.  *Kisela v. Hughes*, 584 U.S. 100, 103 (2018) (per curiam); *Barnes*, 145 S. Ct. at 1363 (Kavanaugh, J., concurring) (cautioning courts against "dissect[ing] and scrutiniz[ing] an officer's actions with the 20/20 vision of hindsight in the peace of a judge's chambers") (citation omitted).

20

C

1

Even if there were a genuine dispute as to the reasonableness of the force Sergeant Burgmann and Officer Nyman used, Scarborough cannot show the two officers violated a clearly established right.  An officer's conduct violates clearly established law when "every reasonable [officer] would have understood that what he is doing violates that right."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation omitted).  The inquiry must be particularized to the facts of the case rather than defined at a high level of generality.  *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *see also Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (explaining clearly established law must be particularized so plaintiffs cannot avoid qualified immunity by "simply alleging violation of extremely abstract rights").  "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situations the officer confronts."  *Kisela*, 584 U.S. at 104 (citation omitted and modified).  Officers are entitled to qualified immunity unless "existing precedent squarely governs the specific facts at issue."  *Id.* (citations omitted.)

Defendants define the right by describing the precise circumstances they argue confronted Sergeant Burgmann and Officer Nyman.[6]  (Mot. for Summ. J. at 20.)  But

---

[6] "Whether the law was clear and well-settled that any reasonable officer; who was responding to a domestic disturbance call, in which the victim's 11 year [old] daughter reported that her Mom's boyfriend 'had just shot a gun at her (Mom),' that her Mom's bedroom door was broken down, and in which, once on scene, responding officers were told that the bedroom blinds were being closed, they heard intermittent female screams of fear, heard a second gunshot and, upon entering the home and giving commands to 'show your hands,' observed Tinsley in the area of the bedroom doorway with an

existing precedent doesn't need to match *exactly*, instead, it needs to "squarely govern[]" the specific facts at issue," *Kisela*, 584 U.S. at 104, such that officers who are "plainly incompetent or those who knowingly violate the law" are liable, not those who cross a line drawn against a "hazy legal backdrop," *Mullenix v. Luna*, 577 U.S. 7, 12, 14 (2015) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Scarborough makes no attempt to articulate a specific right. She argues "Defendants violated Mr. Tinsley's Fourth Amendment rights," citing only *Tennessee v. Garner* for support, apparently for the proposition that deadly force against nonviolent suspects is forbidden. (Pl.'s Resp. in Opp'n at 20–21.) This is too broad a statement of the "specific facts at issue." *Kisela*, 584 U.S. at 104; *see also id.* (explaining the Supreme Court has "repeatedly told courts" "not to define clearly established law at a high level of generality") (citation omitted). *Garner*'s deadly force test may represent "clearly established law" for qualified immunity purposes only in "an obvious case in which all reasonable officers would have immediately known that a suspect did not pose the required threat." *Williams v. City of Canton*, 168 F.4th 933, 942 (6th Cir. 2026) (citation omitted). That is not the case here, so Scarborough "must instead identify a body of relevant case law more specifically tailored" to the facts at hand. *Id.* (citation omitted). But she does not cite a single case other than *Tennessee v. Garner* in her briefing on this topic and does not meaningfully interact with the cases cited by defendants. (Pl.'s Resp. in Opp'n at 20.)

---

object in his hands and bladed from the responding officers such that they did not have a clear view of the hidden hand, the officer could not have reasonably believed that his life was in danger and should not have fired his weapon in protection of his life?"

2

Setting aside the parties' offerings, the right at issue in this case is the right to be free from deadly force where officers responded to a domestic dispute call; had reason to believe the suspect was armed and fired a gun during the dispute; knew that the female involved in the dispute remained inside; heard her yelling and screaming; heard a gunshot; entered the apartment seconds later to aid a potentially wounded victim; issued a verbal warning and encountered a man at the end of a dimly lit hallway turning toward them and raising his hands upward from near his waist. To determine if this right was clearly established by March 2025, when Sergeant Burgmann and Officer Nyman shot Tinsley, the Court has considered Supreme Court precedent, binding Third Circuit Court of Appeals decisions and whether there is a "robust consensus of cases of persuasive authority in the Courts of Appeals." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (citations omitted). The Court has also "take[n] into account district court cases, from within the Third Circuit [and] elsewhere." *Id.*

The law did not establish such a right. To the contrary and as defendants point out, many courts have determined excessive force to be constitutional when officers reasonably believed an unarmed suspect was armed and posed a threat. *See* (Mot. for Summ. J. at 15–17, 20–21) (collecting cases). Sergeant Burgmann and Officer Nyman were not "plainly incompetent," nor did they "knowingly violate the law." *Mullenix*, 577 U.S. at 12 (citation omitted). They are entitled to qualified immunity.

23

IV

A

Scarborough's *Monell* claim, that the Township of Abington failed to train its officers, fails because "municipal liability will only lie where municipal action actually caused an injury," so a municipality "cannot be liable on a failure to train theory for conduct that . . . did not violate the plaintiff['s] constitutional rights." *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003). Because Sergeant Burgmann and Officer Nyman did not violate Tinsley's constitutional rights, there can be no finding of municipal liability against the Township of Abington.

B

Scarborough inconsistently argues her failure to supervise claim. Her pleading alleges failure to supervise only against Chief Molloy. (Am. Compl. at 21.) But in her response briefing she argues only that the Township of Abington failed to supervise its officers. (Pl.'s Resp. in Opp'n at 11, 22, 24–25.) To the extent she alleges a *Monell* violation, it suffers from the same flaw as her failure to train claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

C

The same goes for Scarborough's failure to intervene claim. *Bryant v. City of Philadelphia*, 518 F. App'x 89, 93 (3d Cir. 2013) (per curiam). Even if it weren't fatally flawed given the absence of an underlying constitutional deprivation, her claim falls short. Scarborough argues Burgmann should have said "he's down, stop" to prevent Nyman from shooting Tinsley. (Tr. of Oral Arg., 77:3–6.) The officers collectively fired their weapons over the course of four seconds. "An officer is only liable if there is a

24

realistic and reasonable opportunity to intervene." *Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002).  There was obviously no such opportunity here.

### D

Scarborough's conspiracy claim is also derivative and fails for the same reason. *Lazaridis v. Wehmer*, 591 F.3d 666, 672 (3d Cir. 2010) (per curiam).  In any event, because a plaintiff "may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment," *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) (citation omitted), she may not alter her claim to include Chief Molloy, nor may she introduce a new *post hoc* conspiracy to deny access claim. Even assuming a constitutional deprivation, Scarborough's pleaded claim—that Sergeant Burgmann and Officer Nyman conspired to violate Tinsley's constitutional right—also is meritless.  To prevail on such a claim under section 1983, a plaintiff must prove that persons acting under color of state law reached an understanding to deprive him of his constitutional rights.  *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293–94 (3d Cir. 2018).  Scarborough offers only speculation to support her claim and she may not rely on her "suspicions" to defeat summary judgment.  *Fireman's Ins. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

### E

Scarborough's state law claims have a similar problem.  First, "[p]olice officers are privileged to commit a battery pursuant to a lawful arrest." *Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995).  Where an officer's use of force is constitutionally lawful, there can be no parallel assault and battery claim under state law. *See Boyden v. Township of Upper Darby*, 5 F. Supp. 3d 731, 744 (E.D. Pa. 2014);

25

*Nero v. Whitpain Township*, No. 24-5974, 2026 WL 147010, at \*5 (E.D. Pa. Jan. 20, 2026) ("[B]ecause Plaintiff cannot establish an excessive force claim, his state law assault and battery claims similarly fail as a matter of law.") (citing *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994)).

Furthermore, the Pennsylvania Political Subdivision Tort Claims Act immunizes local agencies and their employees from tort liability subject to certain exceptions, none of which apply here. 42 Pa. C.S. §§ 8542, 8550. At oral argument counsel seemed to suggest defendants conduct falls into a "willful misconduct" exception. (Tr. of Oral Arg., 86:7–87:25, 100:1–103:4.) But willful misconduct means "the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *Renk*, 641 A.2d at 293 (citation omitted). "In the police conduct context, the standard is even higher," and requires Scarborough to show officers "subjectively intended to do something that they knew was wrong." *Paone*, 2024 WL 5107592, at \*7. Scarborough makes no such showing.

Finally, causes of action "under the Pennsylvania Wrongful Death Act and the Pennsylvania Survivor act . . . are strictly derivative—that is, they merely 'provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death.'" *Duvall*, 447 F. Supp. 3d at 338 (citation omitted). Wyleek Tinsley's death, while tragic, was not the result of unlawful conduct by the responding officers.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.

26